UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

ALYSON J. KIRLEIS,

          Plaintiff,                         06cv1495

                                                  **Electronically Filed**

    v.

DICKIE, MCCAMEY & CHILCOTE, P.C.,

          Defendant.

<u>MEMORANDUM OPINION RE: DEFENDANT'S
PHASE ONE MOTION FOR SUMMARY JUDGMENT
ON THRESHOLD EMPLOYMENT STATUS ISSUE (DOC. NO. 130)</u>

**I.       INTRODUCTION AND BACK GROUND**

**A.     Introduction**

Plaintiff Alyson J. Kirleis is an equity Class A Shareholder/Director at defendant law

firm, Dickie, McCamey & Chilcote, PC ("DMC" or "the Firm"), a Pennsylvania professional

corporation.  The relationship between Shareholders of DMC and the corporation are defined by

its By-Laws, pursuant to which plaintiff receives annual compensation and a comprehensive

package of benefits.

Section 3.08(g) of the By-Laws provide Ms. Kirleis with, *inter alia*, a car allowance of

$600 per month, a parking lease at DMC's PPG Place office complex, an annual trip to a legal

seminar or convention with airfare included plus a $2,000 spending allowance, reimbursement of

70% of her annual dues at St. Clair Country Club, and a life insurance policy with a death benefit

of $800,000.  Ms. Kirleis accepted these benefits, and in addition, she accepted: (1) annual

compensation pursuant to Section 4.03(h) of the By-Laws; (2) a position on the Board of

Directors pursuant to Section 2.02; and (3) a right to vote on all DMC matters reserved to the

Board, pursuant to Section 1.03(b) of the By-Laws.[1]  Plaintiff served as a member of various sub-committees of DMC, including as Chair or Co-Chair, and held various management positions, including: Chair of the Associate Review Committee, member of an ad hoc committee charged with administering an Executive Committee election, and member of the Shareholder Evaluation Committee.

After  careful review of defendant's motion for summary judgment, the briefs in support and in opposition, the statements of 920 material facts and counter statements of 920 material facts, and the voluminous supporting materials, the Court finds, as a matter of law based upon undisputed material facts, that plaintiff is not an "employee" within the meaning of the anti-discrimination laws.  Instead, the Court finds plaintiff to be a statutory "employer" who cannot claim the protection afforded by those laws.  Because a reasonable jury could not find otherwise on the record before the Court,[2] the Court will grant summary judgment for defendant on the threshold issue presented in this case, for the reasons to follow.

### B.    The Complaints

Plaintiff has filed suit under federal and state anti-discrimination employment laws alleging that DMC, a Pennsylvania professional corporation engaged in the practice of law, discriminated and then retaliated against her because of her sex, and subjected her to a hostile work environment, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

---

[1] Since 2001, plaintiff has attended 42 of the 96 Board of Directors meetings held through May 2009.

[2]  A contrary finding would, under plaintiff's theory, essentially mean that every Class A Shareholder/Director at DMC, other than perhaps the President and a few members of the Executive Committee, could be considered an "employee."

U.S.C. § 2000e, et seq., and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, et

seq.  Additionally, plaintiff claims that DMC paid her less than similarly situated male Class A

Shareholder/Directors, in violation of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C.

§ 201, et seq.  Plaintiff seeks compensatory damages, punitive damages and injunctive relief.

At a prior stage of the proceedings, a colleague on this Court summarized plaintiff's

claims as follows:

> Plaintiff filed charges of sex discrimination, hostile work environment and
> retaliation with the Equal Employment Opportunity Commission ("EEOC") and
> the Pennsylvania Human Relations Commission ("PHRC") on October 19, 2006.
> Plaintiff then filed suit on December 18, 2006 alleging that the method of
> establishing her annual compensation was not applied to similarly situated male
> attorneys who were performing the same, or less work, than plaintiff. Plaintiff
> further alleges that defendant has a separate and lower employment track for
> female attorneys who have taken maternity leave and/or have children. Plaintiff
> also contends that defendant has a pattern and practice of discriminating against
> women because of their sex in the terms and conditions of their employment,
> including paying lower wages to women, assigning women to lower quality cases,
> and/or assigning women to roles secondary to male attorneys on cases. Plaintiff
> also alleges that defendant maintains a hostile work environment towards women.

Memorandum Order of July 24, 2007 (Doc. No. 54), *Kirleis v. Dickie, McCamey & Chilcote, PC*,

2007 WL 2142397 at *1 (W.D. Pa. 2007) (Lancaster, J.).  In a separate complaint in a related

(and now consolidated and closed action), plaintiff alleges that DMC retaliated against her in

various ways since filing her claims with the EEOC and the PHRC.[3]

## C.    The Threshold Issue

Before litigating these serious allegations, the Court must resolve the threshold issue of

whether plaintiff is properly considered an "employee" of DMC for purposes of the employment

---

[3] The retaliation claim was filed at Civil Action No. 06-1666, which has been closed and
consolidated with this action at Civil Action No. 06-1495.

anti-discrimination laws, Title VII, the PHRA and the FLSA,[4] or whether she must be deemed an

"employer" who is not protected by those laws. Both parties agree that the threshold

determination is controlled by the decision of the United States Supreme Court in *Clackamas*

*Gastroenterology Assocs. v. Wells*, 538 U.S. 440 (2003).

The *Clackamas* Court agreed with the EEOC that the employer-employee determination

should be made with reference to the common-law definition of the master-servant relationship,

focusing on the element of control and six non-exhaustive factors bearing on that relationship.

*Id*. at 442.  Summarizing the EEOC approach adopted in *Clackamas*, the Court stated as follows:

> As the EEOC's standard reflects, an employer is the person, or group of
> persons, who owns and manages the enterprise. The employer can hire and fire
> employees, can assign tasks to employees and supervise their performance, and
> can decide how the profits and losses of the business are to be distributed. The
> mere fact that a person has a particular title – such as partner, director, or vice
> president – should not necessarily be used to determine whether he or she is an
> employee or a proprietor.  See [EEOC Compliance Manual § 605:0009 ("An
> individual's title . . . does not determine whether the individual is a partner,
> officer, member of a board of directors, or major shareholder, as opposed to an
> employee"). Nor should the mere existence of a document styled "employment
> agreement" lead inexorably to the conclusion that either party is an employee. See
> [[EEOC Compliance Manual § 605:0009 (looking to whether "the parties
> intended that the individual be an employee, as expressed in written agreements or
> contracts"). Rather, as was true in applying common-law rules to the independent
> – contractor - versus - employee issue . . . , the answer to whether a
> shareholder-director is an employee depends on "'all of the incidents of the
> relationship . . .  with no one factor being decisive.' " [*Nationwide Mut. Ins. Co. v.
> Darden*, 503 U.S. 318, 324 (1992)] . . . .

*Id*. at 450-51 (additional citation omitted).

The United States Court of Appeals for the Ninth Circuit found four physician-

---

[4] The parties agree that Title VII, the PHRA and the FLSA, all of which are designed to
protect employees, should be similarly interpreted and applied, and that, if plaintiff is deemed to
be an employer, she is not protected by any of these statutes.

shareholders who owned the professional corporation and constituted its board of directors should be deemed to be employees, finding no reason to permit a professional corporation to reap the tax and civil liability advantages of its corporate status and then argue that it is like a partnership so as to avoid employment discrimination liability.  Rejecting this categorical approach, which deemed *any* person working in or for a professional corporation to be an employee, the *Clackamas* case held that shareholder-directors of a professional corporation could, under appropriate circumstances, be counted as "employees" towards the fifteen-employee threshold for covered employers under the Americans with Disabilities Act of 1990 ("ADA"). *Id*.

      *Clackamas* also noted that the "meaning of the term 'employee' comes into play when determining whether an individual is an 'employee' who may invoke" the protections of the ADA.  *Id*. at 447 n.6.  DMC argues that under *Clackamas*, Ms. Kirleis is not its "employee" but is, in fact, an "employer" in the professional corporation and that, therefore, she is not protected by the anti-discrimination laws.  Plaintiff asserts, on the other hand, that the evidence of record, viewed as a whole, precludes summary judgment in favor of DMC on the issue of her employment status "because there are genuine issues of material fact with respect to each of the six *Clackamas* factors. The evidence submitted by Kirleis demonstrates that she does not act independently and is subject to the supervision and control of DMC's Executive Committee, which is a small group of 13 to 15 attorneys who unilaterally make all management decisions for DMC, including determination of annual compensation for all attorneys and support staff, distribution of work assignments, and hiring and firing of attorneys."  Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment (Doc. No. 142) at 3.

D.       **Procedural Background**

On July 24, 2007, another member of this Court[5] entered a Memorandum Order (Doc. No. 54) denying DMC's motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), on the ground that plaintiff is not an employee under the applicable statutes, without prejudice to DMC's ability to raise the employer-employee issue following discovery.[6]  This Memorandum Order also denied DMC's alternative motion to compel arbitration of the claims pursuant to the DMC By-Laws providing for such arbitration because, under Pennsylvania law, which the parties agreed controlled the issue, plaintiff had not expressly agreed to waive her legal claims to arbitration.

DMC filed a timely appeal of the Memorandum Order denying its motion to compel arbitration to the United States Court of Appeals for the Third Circuit, which on March 24, 2009, affirmed the District Court's denial of the motion to compel arbitration.  *Kirleis v. Dickie,*

---

[5] On April 16, 2009, United States District Judge Gary L. Lancaster entered an Order recusing himself (Doc. No. 92), and the case was reassigned to this Judge the following day.

[6] The parties do not suggest that the denial of the motion to dismiss establishes the law of the case on the threshold issue of plaintiff's status as employer or employee.  Indeed, in holding that plaintiff was "an employee covered by the applicable statutes" Judge Lancaster explicitly stated: "We note that although we have weighed the [limited] evidence presented [affidavits and documents], the standard of proof at this point is lower than the standard of proof required for summary judgment. Therefore, we deny defendant's motion to dismiss without prejudice to defendant's right to raise this issue after discovery, if appropriate."  *Kirleis v. Dickie, McCamey & Chilcote, PC*, 2007 WL 2142397 at *6.  A motion for summary judgment, which is filed on the basis of a developed record, serves a different function than a motion to dismiss, which is filed before the commencement of discovery.  *Behrens v. Pelletier*, 516 U.S. 299, 305-313 (1996).  See also *Rouse v. II-VI Inc.*, 2008 WL 2914796 (W.D. Pa. 2008) (McVerry, J.) (collecting numerous cases recognizing that the law of the case doctrine does not preclude a grant of summary judgment in favor of a defendant whose motion to dismiss has previously been denied).

*McCamey & Chilcote, P.C.*, 560 F.3d 156 (3d Cir. 2009).[7]  The Court of Appeals for the Third

Circuit affirmed the District Court's finding that Ms. Kirleis had not expressly agreed to arbitrate

her claims because there was no evidence that she had actually received a copy of the DMC By-

Laws, and she was unaware of the existence of the arbitration provision contained therein.

Accordingly, because Pennsylvania law did not recognize an implicit agreement to arbitrate her

claims, the arbitration provision of the By-Laws was unenforceable.

After the Court of Appeals entered its Mandate (Doc. No. 94) on May 11, 2009, this

Court convened an initial case management conference.  DMC filed a Motion for Bifurcation of

Discovery and Dispositive Motion Proceedings, (Doc. No. 96), and plaintiff filed her response in

opposition.  After hearing argument on this motion at the case management conference, this

Court entered an Order (Doc. No. 110) on June 11, 2009, granting the motion to bifurcate

discovery,[8] and setting a schedule for Phase I discovery on the threshold issue of plaintiff's status

as employer or employee.

Following extensive discovery, DMC filed its motion for summary judgment, concise

statement of 194 material facts, and brief in support of summary judgment, Ms. Kirleis filed her

response, counter statement of 194 material facts with 726 additional facts and brief in

opposition, and defendant filed a reply brief and counter statement to plaintiff's 726 additional

facts.  The threshold issue is now ripe for determination.

-----

[7] DMC did not appeal the District Court's Order denying its motion to dismiss, which obviously was interlocutory.

[8] Bifurcation into threshold phase discovery and merits phase discovery is a common practice in employment discrimination cases.  See, e.g., *Ziegler v. Anesthesia Assocs. Of Lancaster, Ltd.*, 74 Fed. Appx. 197, 198 (3d Cir. 2003).

## II.      Legal Principles

## A.      Summary Judgment Standards

Fed.R.Civ.P. 56(c) currently provides that on a motion for summary judgment, the "judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  "Rule 56 of the Federal Rules of Civil Procedure 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007), citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Summary judgment is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Woodside v. Sch. Dist. of Philadelphia Bd. of Educ.*, 248 F.3d 129, 130 (3d Cir. 2001), quoting *Foehl v. United States*, 238 F.3d 474, 477 (3d Cir. 2001) (citations omitted).

An issue of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); see also *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof."), citing *Anderson* and *Celotex Corp.*  Recently, the United States Supreme Court  "emphasized, [w]hen the moving

party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372 (2007) (internal quotations omitted), quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to, draw all reasonable inferences, and resolve all doubts, in favor of the nonmoving party.  *Doe v. County of Centre, PA*, 242 F.3d 437, 446 (3d Cir. 2001); *Woodside*, 248 F.3d at 130; *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 151 (3d Cir. 1999).  Further, a court must not engage in credibility determinations at the summary judgment stage.  *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3d Cir. 1998), quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994).

## B.   Substantive Principles - the *Clackamas* Test

In order to make a claim under Title VII, the FLSA or the PHRA, Ms. Kirleis must first establish that she was an employee of DMC, at all times relevant to her claims.  Title VII, the FLSA[9] and the PHRA[10] were meant to protect only "employees and potential employees,"

---

[9] The Supreme Court in *Darden* noted that because of the statutory definition of the verb employ, the term employee has a much broader meaning under the FLSA.  That definition "stretches the meaning of 'employee' to cover some parties who might not qualify as such under strict application of traditional agency law principles."  *Darden*, 503 U.S. at 326.  The parties herein, however, do not suggest that the meaning of "employees" under the FLSA should be judged by any standard other than *Clackamas*.

[10] In the case of the PHRA, the Court of Appeals in *Goosby v. Johnson & Johnson Medical, Inc.*, determined that "[t]he analysis required for adjudicating [a] claim under PHRA is identical to a Title VII inquiry."  *Goosby*, 228 F.3d 313, 317 (3rd Cir. 2000).

therefore, it is critical to make the distinction between employees and employers.  *Serapion v. Martinez*, 119 F.3d 982, 985 (1st Cir. 1997).

There is no dispute between the parties that the question of whether Ms. Kirleis is an employee is a "preliminary threshold issue" and that plaintiff bears the burden of proving that she was an employee, not an employer.[11]  See *Steelman v. Hirsch*, 473 F.3d 124, 128 (4th Cir. 2007) (citing *Benshoff v. City of Virginia Beach*, 180 F.3d 136, 140 (4th Cir. 1999)) ("A plaintiff bears the burden of establishing that she is an employee."); *Simpson v. Ernst & Young*, 100 F.3d 436, 439 (6th Cir. 1996) ("the distinction between a partner and an employee . . . is a preliminary jurisdictional issue.").  Moreover, "a single individual in a single occupational setting cannot be both an employer and an employee." *Ziegler v. Anesthesia Assocs. Of Lancaster, Ltd.*, 74 Fed.Appx. 197 (3d Cir. 2003) (finding four shareholder-physicians to be employers) (quoting *Serapion*, 119 F.3d at 985); *Devine v. Stone, Leyton & Gershman, P.C.*, 100 F.3d 78, 80-81 (8th Cir. 1996), *cert. denied*, 520 U.S. 1211 (1997).

While the anti-discrimination statutes define the term "employee," the definition is "completely circular and explains nothing." *Clackamas,* 538 U.S. at 444 (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322 (1992)).  Title VII and the PHRA define the term "employee" as "an individual employed by an employer."  42 U.S.C. §2000e(f), 29 U.S.C. §203

---

[11] The parties treat this threshold issue as a question of jurisdiction.  It is not.  In *Arbaugh v. Y&H Corp.*, the Supreme Court resolved a split among the Courts of Appeals and explicitly held that the question of whether a person is an employee for purposes of the numerosity requirement is not jurisdictional, but rather a threshold question going to the merits of plaintiff's Title VII claim.  *Arbaugh*, 546 U.S. 500, 515-16 (2006), *overruled on other grounds* ("when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as non-jurisdictional in character. . . . "[W]e hold that the threshold number of employees for application of Title VII is an element of a plaintiff's claim for relief, not a jurisdictional issue.").  If the numerosity requirement is not jurisdictional, certainly the employee-employer issue is not a matter of jurisdiction.

(e) and 43 P.S. §954(b).  Thus, the EEOC and the Supreme Court had to look outside the statutes for guidance.

In *Clackamas*, the Supreme Court agreed with the EEOC that "Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine."  *Clackamas*, 538 U.S. at 445 (quoting *Darden*, 503 U.S. at 322-23).  The master-servant relationship is generally described as a relation where "the employer has the right to select the employee, the power to remove and discharge him and the right to direct both what work shall be done and the manner in which it shall be done."  *Blacks Law Dictionary*, 879 (5th ed. 1979).

Prior to *Clackamas*, there had been a split among the Courts of Appeals as to how to define the term "employee" in the context of a professional organization, in a meaningful and workable manner.  The Court of Appeals for the Seventh Circuit applied an "economic realities" test.  The economic realities test considered myriad facts and circumstances regarding the professional organization and its professional members, generally concluding that a shareholder in a professional corporation is more analogous to a general equity partner in a partnership, who is an "employer," than it is to a shareholder of a general corporation.  *Clackamas*, 538 U.S. at 442 (citing EEOC *v. Dowd & Dowd, Ltd., P.C.*, 736 F.2d 1177, 1178 (7th Cir. 1984)).[12]  The Supreme Court declined to follow the economic realities test to the extent that the analysis of "employer-employee" status ceased once a court determined the individual was akin to a partner

---

[12] In evaluating the "economic realities" of the professional business relationship, the following factors are considered: the permanency of the relationship; the degree of skill required for the particular job; the worker's capital investment; the opportunity for profit or loss; the employer's right to control; and whether the worker was an integral part of the employer's business.  See *Donovan v. Brandel*, 736 F.2d 1114, 1117 (6th Cir. 1984) (citing *Real v. Driscoll Strawberries Associates, Inc.*, 603 F.2d 748 (9th Cir. 1979).

in a partnership, who is always deemed to be an employer.  *Clackamas*, 538 U.S. at 446 ("The

question whether a shareholder-director is an employee, however, cannot be answered by asking

whether the shareholder-director appears to be the functional equivalent of a partner. Today there

are partnerships that include hundreds of members, some of whom may well qualify as

"employees" because control is concentrated in a small number of managing partners. Cf. *Hishon*

*v. King & Spalding*, 467 U.S. 69, 79, n. 2 (1984) (Powell, J., concurring) ("[A]n employer may

not evade the strictures of Title VII simply by labeling its employees as 'partners'")").

  The Supreme Court also rejected the approach taken by the Court of Appeals for the

Second Circuit, an even more categorical, "employee friendly" approach, wherein professional

corporations are viewed in the corporate format, and individuals who work for a professional

corporation must be considered to be employees of the corporation.  In *Hyland v. New Haven*

*Radiology Assocs.*, the Court of Appeals stated that the "incorporators of a professional

corporation make a deliberate decision to adopt the corporate form for their business in order to

avail themselves of important tax, employee benefit, and civil liability advantages.  Having freely

made the choice to adopt this form of business organization they should not now be heard to say

that their firm is essentially a  . . . partnership and not a corporation." *Hyland*, 794 F.2d 793, 798

(2d Cir. 1986) (after electing to do business in a corporate form, defendant can not later assert

that in economic reality the business was a partnership and that the plaintiff was a partner.).

  The Court in *Clackamas* rejected both of these categorical approaches, and adopted the

functional test developed by the EEOC, the agency charged with enforcing the anti-

discrimination statutes,[13] to resolve the question of who qualifies as an employee.  *Clackamas*,

---

[13] In *Clackamas*, Plaintiff had filed suit under the Americans with Disabilities Act (ADA).
However, the EEOC is also responsible for administration of Title VII.  Further, the EEOC's

538 U.S. at 448.  The EEOC had adopted a "master-servant control" test that focuses on the

common-law touchstone of control to determine whether a person is an employee or an

employer.  *Clackamas*, 538 U.S. at 440 (citing 2 EEOC Compliance Manual §605.0009 (2000)).

This test sets forth six factors to be considered when determining "whether an individual acts

independently and participates in managing the organization, or whether the individual is subject

to the organization's control."  *Clackamas*, 538 U.S. at 449-50 (quoting 2 EEOC Compliance

Manual §605.0009 (2000)).  These six factors are as follows:

> Whether the organization can hire or fire the individual or set the rules and regulations of the individual's work.

> Whether and, if so, to what extent the organization supervises the individual's work.

> Whether the individual reports to someone higher in the organization.

> Whether and, if so, to what extent the individual is able to influence the organization.

> Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts.

> Whether the individual shares in the profits, losses, and liabilities of the organization.

*Clackamas*, 538 U.S. at 449 (quoting 2 EEOC Compliance Manual §605.0009 (2000)).

The six *Clackamas* factors are not exhaustive and "the answer to whether a shareholder-

director is an employee depends on all the incidents of the relationship . . . with no one factor

---

manual states that it applies across the board to other federal anti-discrimination statutes, including the FLSA, also known as the Equal Pay Act (EPA).  See *Clackamas*, 538 U.S. at 444 fn. 3.  See also, *Serapion*, 119 F.3d at 985 (statutes with similar definitions of the term employee are regarded as being "*in pari passu* and endorse the practice of treating judicial precedents interpreting one such statute as instructive in decisions involving another.")

being decisive." *Clackamas*, 538 U.S. at 450-51, n.10 (internal quotations omitted).  Moreover, a

person's title and labels on documents are not determinative of whether the person is an

employee for whom protections should be afforded under anti-discrimination laws, so titles such

as "partner" and "shareholder" are not dispositive.  *Id.*, at 450.  There is no "shorthand formula or

magic phrase" that is determinative of the issue whether a person is an employee, which must be

determined on a case by case basis with reference to the totality of the facts.  *Clackamas*, 538

U.S. at 449, n.10.

While *Clackamas* analyzed the term employee with regard to whether an employer met

the fifteen employee threshold under the ADA, the Supreme Court also stated that the same

analysis is appropriate in determining whether a plaintiff qualifies as an employee, and therefore

is protected by the ADA.  *Clackamas*, 538 U.S. at 444 n.3 and 446 n.6.

In summary, the Supreme Court stated:

> As the EEOC's standard reflects, an employer is the person, or group of
> persons, who owns and manages the enterprise. The employer can hire and fire
> employees, can assign tasks to employees and supervise their performance, and
> can decide how the profits and losses of the business are to be distributed. The
> mere fact that a person has a particular title - such as partner, director, or vice
> president - should not necessarily be used to determine whether he or she is an
> employee or a proprietor. See ibid. ("An individual's title  . . .  does not determine
> whether the individual is a partner, officer, member of a board of directors, or
> major shareholder, as opposed to an employee"). Nor should the mere existence of
> a document styled "employment agreement" lead inexorably to the conclusion that
> either party is an employee. See ibid. (looking to whether "the parties intended
> that the individual be an employee, as expressed in written agreements or
> contracts"). Rather, as was true in applying common-law rules to the independent-
> contractor- versus- employee issue confronted in *Darden*, the answer to whether a
> shareholder-director is an employee depends on " 'all of the incidents of the
> relationship . . . with no one factor being decisive.' "

*Clackamas*, 538 U.S. 449-50 (footnotes and citations omitted).

### III.     Facts of Record

Unless otherwise indicated, the following facts of record, adduced from the summary judgment supporting materials, either are not in dispute or are historical facts the substance of which has not been challenged, even though the parties may "deny" some statements based on divergent inferences drawn therefrom or for some other non-content related reason.

### A.     Background

DMC is a Pittsburgh based professional corporation at which Ms. Kirleis has practiced law for over twenty years: ten years as an associate attorney, three years as a Class B Shareholder, and for almost nine years, as a Class A Shareholder/Director.  Plaintiff's election as a Class A Shareholder/Director of the Firm, effective January 1, 2001, was made in accordance with an election held pursuant to Section 3.08 of DMC's By-Laws.  Although plaintiff maintains that in practice, the DMC By-Laws are not routinely followed or distributed to Shareholders, and that she never received a copy or saw the By-Laws until after she commenced this litigation, the relationship between DMC's Shareholders, associate attorneys and staff officers and employees and the professional corporation is ostensibly governed by detailed By-Laws of the corporation.

### B.     By-Laws

Pursuant to the By-Laws, all Class A Shareholders are members of DMC's Board of Directors.  The only differences between a Class B Shareholder and a Class A Shareholder/ Director are that Class B Shareholders cannot vote (nor can associate attorneys or other staff employees), are not Directors of the Firm, and are not eligible for certain benefits for which Class A Shareholder/Directors are eligible.

As noted, section 3.08(g) of the By-Laws provided Kirleis with a car allowance, parking lease, annual trip to a legal seminar or convention with airfare included plus spending allowance, reimbursement of 70% of annual country club dues, and a life insurance policy.  In addition to these benefits, Ms. Kirleis also accepted (1) compensation pursuant to Section 4.03(h) of the By-Laws; (2) a position on the Board of Directors pursuant to Section 2.02; and (3) a right to vote on all DMC matters reserved to the Board, pursuant to Section 1.03(b).  Class B Shareholders are not eligible for the car lease allowance of $600 per month, insurance on the car or the annual legal seminar or convention trip.

Plaintiff does not deny the substance of these historical facts, but she vigorously denies that the conferral and acceptance of these benefits were "pursuant to the By-Laws."  Plaintiff's persistent refrain regarding the effect of the DMC By-Laws is that up until this litigation, she had not been given a copy of the By-Laws, had never actually seen the By-Laws, and never asked to see the By-Laws because she "understood" they were in the process of being revised, and were in a "state of flux." (As discussed more fully, infra, plaintiff does not offer any facts to contradict defendant's averment that the By-Laws were always available to any Shareholder/Director.)

The DMC By-Laws[14] specifically reserve certain decisions to the Board of Directors and provide, among other things:

(a) Section 3.08 of the By-Laws specifically reserves to the Board of Directors as a whole, of which Plaintiff is one, decisions regarding:

(i) Any matter which requires a three-fourths vote of all of the Class A Shareholders, including, but not limited to, the making and/or removing of Shareholder/Directors and amendment of the By-Laws;

---

[14] There were two sets of By-Laws in effect during relevant time periods: By-Laws effective April 13, 1993 (Doc. No. 144-13), and By-Laws effective April 5, 2007 (Doc. No. 133-3).

(ii) Approval of any and all mergers and acquisitions;

(iii) Approval of new offices and/or the location of the Firm's existing offices;

(iv) Approval of the Firm's annual expense budget;

(v) Approval of long-range business and marketing plans; and

(vi) Changes to the Firm's profit sharing plan and determination of benefits.

(b) Section 3.01 of the By-Laws specifically reserves to the Board of Directors as a whole, of which Plaintiff is one, decisions regarding election of the Firm's officers every two years.

(c) Section 4.03 of the By-Laws specifically reserves to the Board of Directors as a whole, of which Plaintiff is one, decisions regarding election of the members to the Firm's Executive Committee each year, with seats held on staggered terms.

(d) Section 4.02 of the By-Laws specifically reserves to the Board of Directors as a whole, of which Plaintiff is one, decisions regarding election of Chairpersons of the Firm's Committees every two years.

(e) Section 10.01 of the By-Laws specifically reserves to the Board of Directors as a whole, of which Plaintiff is one, decisions regarding any amendments to the By-Laws.

Defendant's Concise Statement of Undisputed Material Facts (Doc. No. 132), at ¶ 35.[15]

The By-Laws also create the Executive Committee, a standing committee of the Board of

Directors, pursuant to section 4.03, which provides, in most relevant part, as follows:

---

[15] Although plaintiff argues that these By-Laws are not dispositive because she had not seen them, and because they have not been enforced or followed in practice, she notes that Section 3.08 of both sets of By-Laws are the same.  See Plaintiff's Response to Defendant's Concise Statement of Undisputed Material Facts Supporting Defendant's Motion for Summary Judgment (Doc. No. 132) and Plaintiff's Statement of Additional Material Facts" ("Plaintiff's Response to Defendant's Concise Statement of Undisputed Material Facts") (Doc. No. 143), at ¶ 35.  The Court notes that section 103 and 206 of the By-Laws, quoted verbatim in text, infra, are also identical.

(a) Pursuant to Section 4.03(a) of the By-Laws, the Executive Committee is compromised of the President, the Managing Director, and ten other Class A Shareholders, six of whom are elected by the Board of Directors, and four of whom are appointed by the President.

(b) Pursuant to Section 4.03(a) of the By-Laws, those Class A Shareholders elected to the positions of Secretary/Treasurer, General Counsel, and Marketing Director by the Board of Directors also serve as ex-officio members of the Executive Committee.

(c) Pursuant to Section 4.03(a) of the By-Laws, ex-officio members of the Executive Committee vote on all matters except compensation.

(d) Pursuant to Section 4.03(b) of the By-Laws, Executive Committee terms are for three years.

(e) Pursuant to Section 4.03(e) of the By-Laws, the Board of Directors has delegated certain decisions to the Executive Committee, including:

(i) The determination of compensation to be paid to all Shareholders, Officers, Directors, and employees of the Firm;

(ii) Any changes or adjustments to the capital contributions to the Firm by its Shareholders;

(iii) The establishment and maintenance of reasonable reserves to meet the anticipated capital needs of the Firm; and

(iv) All other Firm matters not specifically reserved to the Board of Directors under Section 3.08 of the By-Laws.

(f) Pursuant to Section 4.03(f) of the By-Laws, the Board of Directors has absolutely delegated responsibility in areas (i) through (iv) above to the Executive Committee and has provided the Executive Committee with "full discretion and authority to act" in these areas.

(g) Pursuant to Section 4.03(f) of the By-Laws, all books and records of the Executive Committee must be open to inspection by all Shareholders, with the exception of those records relating to compensation paid, or to be paid, to Officers, Directors, or Shareholders.

(h) Pursuant to Section 4.03(f) of the By-Laws, records relating to compensation paid, or to be paid, to Officers, Directors, or Shareholders must

-18-

remain confidential "unless disclosure of all or any part thereof shall be required by a majority vote of the Class A Shareholders."

> (i) Pursuant to Section 4.03(g) of the By-Laws, any Shareholder may attend any meeting of the Executive Committee, and any Shareholder may review the minutes of any meeting of the Executive Committee, with the exception of any meeting where compensation is set.

Defendant's Concise Statement of Undisputed Material Facts (Doc. No. 132), at ¶ 113.[16]

Additionally, pursuant to Section 4.03(h) of the By-Laws:

> The compensation, including both salary and bonus, of each shareholder shall be determined by the committee by fixing, at the beginning of each fiscal year, such Class A and Class B shareholder's percentage interest of the net profits of the corporation. For these purposes, "net profits" means the profits of the corporation prior to payment of compensation to any shareholder of the corporation. The manner of payment of such compensation, the allocation of compensation between salary and bonus, and any decision regarding the borrowing and repayment of funds to pay compensation shall be exclusively within the discretion of the Committee.

By-Laws, Section 4.03(h).

### D.      Operation of the By-Laws

The actual operation of the By-Laws is the primary point of contention in the

determination of whether plaintiff is an employer or an employee. DMC contends that the By-

Laws run DMC; pursuant to those By-Laws, as written and in practice, plaintiff is an owner and

manager of the professional corporation under the *Clackamas* control test, and therefore is an

---

[16] Section 4.03, EXECUTIVE COMMITTEE, appears in the 2007 By-Laws, and does not appear to have an exact counterpart in the 2003 By-Laws. See note 8, supra. Under section 403 of the 2003 version, exclusive authority to set compensation, fringe benefits, etc., and confidentiality of records relating to compensation, were reposed in a Compensation Committee. There do not appear to be any substantive or material differences between the versions with regard to the authority of the Compensation and the Executive Committees, and plaintiff does not suggest otherwise. See Plaintiff's Response to Defendant's Concise Statement of Undisputed Material Facts (Doc. No. 143), at ¶ 113. The references in text are to the 2007 version of the By-Laws.

employer.  Although certain matters are delegated, with "full discretion and authority to act," to

the Executive Committee, any Class A Shareholder/Director, including plaintiff, may be elected

to and serve on the Executive Committee, and the powers and authority of the Executive

Committee may be circumscribed or enhanced by amendment to the By-Laws by 3/4 of the Class

A Shareholder/Directors eligible to vote.

Plaintiff denies the significance of the authority granted Class A Shareholder/Directors by

the By-Laws, and downplays the significance of their participation in Board of Directors

meetings.  Moreover, plaintiff never received a copy of the By-Laws, although she reluctantly

concedes that she never asked to see a copy because, as she asserts repeatedly, she "understood"

the By-Laws were in the process of being revised and were in a "state of flux," and "understood"

that she would not have been able to see them, even though they were available at all times.

(Plaintiff does not specifically dispute DMC's statement that the By-Laws were always available

to any Shareholder/Director, based solely on her "understanding" that they were being revised

and were in a "state of flux.")  Plaintiff also maintains that the By-Laws are mostly a theoretical

document largely ignored by the Executive Committee, and that, in practice, DMC is supervised,

run and managed by a small group of Class A Shareholder/Directors on the Executive

Committee.

According to plaintiff, for the period from January of 2001 through 2008, nine members

of the Executive Committee, who constitute a majority of the membership of the Executive

Committee, remained the same: James Miller, Jeffrey Wiley, Daniel Stefko, John Pion, Charles

Brown, Steven Houghton, Joseph Christof, Robert Marino and John Wall.  See Plaintiff's

Response to Defendant's Concise Statement of Undisputed Material Facts Supporting

Defendant's Motion for Summary Judgment (Doc. No. 132) and Plaintiff's Statement of

Additional Material Facts" ("Plaintiff's Response to Defendant's Concise Statement of

Undisputed Material Facts") (Doc. No. 143), at ¶ 217.  Also, during the relevant time period,

Wilbur McCoy Otto, Jeffrey Wiley, Daniel P. Stefko, Marcelle Theis and John Conti, who are

the individuals who assigned and monitored the work for the university of Pittsburgh Medical

Center ("UPMC"), which is and was DMC's largest client, were or are members of the

Executive Committee.  *Id*. at ¶¶  218-222.

Mr. Otto, who was the President of DMC and the Chair of the Executive Committee,

appointed Theis and Conti to the Executive Committee in 2004.  *Id*. at ¶¶  218, 220.  Mr. Otto

was, at all relevant times, General Counsel for UPMC's captive insurance carrier, the University

Health Center of Pittsburgh Insurance Program ("UHCP"), which had been a long-standing and

significant client of DMC.  (DMC's relationship with UPMC and the UHCP Insurance Program

dates back more than thirty years.)

Contrary to DMC's assertions, Kirleis claims that her membership on DMC's Board of

Directors, which is comprised of all Class A Shareholders (ranging in number during the relevant

period from 61 to 69 persons), does not afford her the "ability or opportunity to make decisions

for the firm or to even offer meaningful input into or influence over decisions to be made

regarding the business, management and operation of the firm.  Rather, the Board of Directors'

participation in management decisions is merely a pro forma after-the-fact ratification or rubber

stamp of decisions already made and actions already taken by the Executive Committee prior to

any given monthly Board meeting."  Plaintiff's Brief in Opposition to Defendant's Motion for

Summary Judgment (Doc. No. 130) (Doc. No. 142), at 2-3.

### E.       Board of Directors Meetings

All significant DMC business is proposed by the Executive Committee or other Class A

Shareholder/Directors and conducted by vote at meetings of the Board of Directors.  Pursuant to

Section 2.04 of the By-Laws, the Board of Directors meets once a month, every month of the

year, on meeting dates that are set and published on DMC's intranet at the beginning of each

year;  monthly reminders of the meetings are sent each month on the intranet to each

Shareholder/Director, and the agenda for each meeting is circulated to all Shareholder/Directors

in advance of each meeting. (Plaintiff asserts that the agendas are set by the Executive

Committee and that the agenda descriptions are vague.)

No associate attorney or other employee may attend Board of Directors meetings unless

they are specifically invited to do so.  All Shareholder/Directors, can attend, or not attend, any or

all of these meetings as the Shareholder sees fit, and if unable to attend any meeting of the Board

of Directors in person, he or she can attend by phone or proxy.  Since 2001, Plaintiff has attended

42 of the 96 Board of Directors meetings held through May 2009.  Minutes of all meetings of the

Board of Directors are recorded by the Firm's Controller, Jay Schwartz, and copies of the

minutes of each meeting are circulated to all members of the Board following each meeting.

Further, at the commencement of each meeting of the Board of Directors, there is a motion to

approve the minutes of the last meeting of the Board, and if no Shareholder/Director voices

concern that the minutes are inaccurate, the minutes are ratified by the Board.

### F.       Quorum of Board of Directors

A major undisputed factor upon which Ms. Kirleis relies concerns the make-up and

decisions made at Board of Directors meetings conducted from 2001 through June of 2009, as

reflected in the minutes of those meetings.  DMC does not contest plaintiff's factual assertions

that 88 of 97 Board of Directors meetings during that period were conducted without a quorum

of those Board of Directors *eligible to vote* being present at the meetings, in support of her

argument that the Board of Directors merely "rubber stamped" the Executive Committee which

had already made the decisions and simply obtained oral ratification from the members of the

Board of Directors present at the meetings.  See, e.g., Plaintiff's Response to Concise Statement

of Undisputed Material Facts, (Doc. No. 143), at ¶¶ 639- 784.  DMC claims, on the other hand,

that the By-Laws did *not* mandate a quorum of all *eligible* Class A Shareholder/Directors to

make most decisions and policies, but only a quorum of those *present or participating by*

*telephone or proxy* at the Board of Directors meetings, under section 2.06(a) and (b) of the By-

Laws, and that the custom and practice of DMC Board of Directors meetings consistently

followed this interpretation of the By-Laws in enacting resolutions, making policy decisions and

conducting other business.

      The Court agrees that the By-Laws, by their plain meaning, support the custom and

practice at DMC regarding business transacted at Board of Directors meetings.  Article I,

MEETINGS OF SHAREHOLDERS, provides in relevant part as follows:

> (a) QUORUM:  At all meetings of the shareholders, the *presence in*
> *person, by telephone or by written proxy of at least a majority of the Class A*
> *shareholders shall be necessary and sufficient to constitute a quorum for the*
> *transaction of business.  If a quorum is not present* at any meeting, the meeting
> *may be adjourned* from time to time by a majority of the Class A shareholders
> present, until a quorum, shall be present; but immediate written notice of the date,
> time, and place to which such meeting is adjourned shall be given to any
> shareholder not present at the meeting.

> (b) VOTING:  At any duly convened meeting of the shareholders
> resolutions on *the following matters shall require the affirmative vote of a three-*

*fourths (3/4ths) majority of all the Class A shareholders* to be adopted; (i) Termination of employment of any shareholder employee; (ii) Election of any new shareholder-employee; (iii) Adoption, amendment or repeal of these By-Laws, and (iv) Dissolution of the corporation.  *In all other cases*, resolutions of the shareholders shall require the *affirmative vote of a simple majority of the Class A shareholders present in person, by telephone or by proxy* to be adopted, except as otherwise provided by law.  Class B shareholders shall have no vote either as shareholders or committee members.

Section 1.03 (a) and (b).

Article II spells out the role and duties of DMC's Directors.  Section 2.06,

ORGANIZATION AND MANNER OF ACTING, provides in relevant part as follows:

(a) QUORUM.  At all meetings of the Board of Directors , the presence in person or by telephone of at least *a majority of the Directors in office* shall be necessary and sufficient to constitute a quorum for the transaction of business.  *If a quorum is not present* at any meeting, *the meeting may be adjourned* from time to time by a majority of the directors present, until a quorum shall be present . . . .

(B) VOTING.   At any duly convened meeting of the Directors, resolutions or other actions of the Board *shall require the affirmative vote of a simple majority of the Directors present in person, by telephone, or by written proxy* to be adopted, except as otherwise expressly required herein or by law.

Section 2.06 (a) and (b).

The Court agrees that the above quoted language supports DMC's interpretation of its

By-Laws that, except for the matters set forth in section 1.03(a) (i)-(iv), a simple majority of the

Shareholder/Directors *present* in person, by telephone, or by proxy suffices for voting on

resolutions and other DMC actions.  While a quorum of the Board of Directors is defined as "the

presence in person or by telephone of at least a majority of the Directors *in office*," Section

2.06(a), a majority of the Directors present "may" (discretionary) adjourn any meeting having

less than a quorum of eligible Directors.  Section 2.06(b), however, provides that resolutions and

other actions of the Board "shall require" (mandatory) "the affirmative vote of a simple majority of the Directors *present* in person, by telephone, or by written proxy . . . ."

Moreover, it is undisputed that 88 of 97 Board of Directors meetings proceeded without a quorum of all eligible Class A Shareholder/Directors being present, and that important DMC resolutions, decisions and policies were routinely made at said meetings and thereafter followed, consistent with DMC's interpretation of the By-Laws.  Thus, it cannot be disputed that it was the custom and practice at DMC to transact business and make decisions at Board of Directors by the affirmative vote of a simple majority of the Directors *present* in person, by telephone, or by proxy.

In addition, plaintiff was present at 42 of the meetings, and there is no indication on the record that she ever objected to proceeding with any meeting without a quorum of all eligible Class A Shareholder/Directors present, or otherwise challenged resolutions and other business decisions that had been made at such meetings,[17] and the summary judgment record does not show that any other Shareholder/Director so objected to the conduct of the meetings or decisions made at said meetings as being ultra vires.

### G.     Business Conducted at Board of Directors Meetings

A wide variety of DMC business is discussed and conducted at Board of Directors meetings, as reflected in the minutes of the meetings.   See, e.g., Defendant's Concise Statement of Undisputed Material Facts (Doc. No. 132), at ¶¶  34(a)-(k), 42(a)-(iiii); Plaintiff's Response to Defendant's Concise Statement of Undisputed Material Facts (Doc. No. 143), at ¶¶  34(a)-(k),

---

[17] To be sure, plaintiff asserts that any such objections would have been meaningless, and that Shareholder/Directors were intimidated from voicing opposition by Mr. Otto and other members of the Executive Committee who, she argues, controlled their work and livelihoods.

42(a)-(iiii).  For example, business conducted at Board of Directors meetings includes, but is not limited to, the following: discussion of financial information and policies; the potential of opening new offices in other locales; discussion of sub-committees' work and make-up; nominations for and voting on elections of new Class A Shareholder/Directors; selection of summer law clerks from whom new associates are hired; hiring of new associates.  There is no need to go into greater detail at this point; suffice it to say for now that a wide range of business is conducted and decisions and policies are made at such meetings pursuant to DMC's custom and practice.

 For the most part, plaintiff does not dispute the content of the minutes of the Board of Directors meetings, but she strongly argues that the meetings are meaningless.  Plaintiff asserts that these meetings are mere "rubber stamps" for decisions already made by the Board of Directors and that non Executive Committee Directors do not meaningfully participate in the Board of Directors meetings and decisions, and for that reason, many Shareholders often choose not to attend.  Further, plaintiff claims that the Executive Committee does not merely organize or recommend actions to the Board of Directors, but instead, makes all decisions regarding the management and operation of DMC in advance of meetings, and presents their decisions to the Board of Directors of DMC for an "after-the-fact oral ratification or rubber stamp," frequently by oral yea or nay votes prefaced by a request for a showing or sign of support for what the Executive Committee has already decided or done; the Executive Committee controls its own membership by not taking nominations for open positions, but by simply proffering the member whose term is expiring as the only "nominee."  Plaintiff's Response to Defendant's Concise Statement of Undisputed Material Facts (Doc. No. 143), at ¶¶  34(a)-(k), 42(a)-(iiii), 519.

While the minutes support plaintiff's position in that the great majority of the Shareholder/Director votes at DMC Board of Directors approve motions and proposals made by the Executive Committee, this is not always the case. Plaintiff herself, and other non Executive Committee Shareholders, have participated in policy decisions and have opposed certain Executive Committee positions, and have sometimes prevailed, sometimes not. For example, the minutes of meetings reflect that plaintiff opposed elections of Class A Shareholder/Directors even though they had been recommended by the Executive Committee, and that her view had prevailed. The minutes also reflect that at times there were multiple applicants for vacancies on the Executive Committee and competition amongst Class A Shareholder/Directors, and that the positions were not simply filled by adopting a "slate" proposed by the Executive Committee, and that sub-committees had been formed, with plaintiff as chair or co-chair, to gather the nominations and organize the ballots. Also at series of Board of Directors meetings, various important policies were adopted after input from sub-committees including advocacy by non Executive Committee Shareholder/Directors, such as the Work/Life Balance Policy, the Maximum Yearly Billable Hour Policy and policy related to the composition of and age and term limits for the Executive Committee which was authored and advocated by six Shareholder/Directors, four of whom were not and had never been members of the Executive Committee. See Defendant's Concise Statement of Undisputed Material Facts (Doc. No. 132) at ¶¶ 43(a)-(iiii), 44-50, and Plaintiff's Response to Defendant's Concise Statement of Undisputed Material Facts (Doc. No. 143) at ¶¶ 43(a)-(iiii), 44-50.

Other pertinent facts will be discussed in section V, below, applying the law to the facts, as relevant to the particular *Clackamas* factor heading in which it has been placed.

IV.     **Application of the six *Clackamas* Factors**

The Court notes that the six EEOC/*Clackamas* factors are somewhat overlapping, so that particular facts might logically be placed in more than one category.  Moreover, the six factors are non-exhaustive, and all of the factors and any other important facts or circumstances must be considered and weighed together, with no one factor being talismanic.  Further, many of the facts adduced by the parties are not material to the issues discussed herein or are redundant or cumulative of other representative facts, and have not been discussed in this opinion.[18]  With that preface, the Court will discuss the six EEOC/ *Clackamas* factors, seriatim.

A.     **Whether the organization can hire or fire the individual**

**Hiring**

All Shareholders of either Class A or B are elected and invited to join DMC as a Shareholder by a 3/4 majority of the Class A Shareholder/Directors, as section 103(b) of the By-Laws and the minutes of meetings demonstrate.  Plaintiff herself participated in many of these meetings for election of new Shareholders.  Plaintiff was elected to the Board of Directors pursuant to the By-Laws as a Class A Shareholder/Director in 2001, and she accepted the offer to become a Class A Shareholder/Director effective January 1, 2001.  At that point, plaintiff had the authority under section 103(b) to "hire" (i.e., elect) new Shareholders, although it is an authority shared equally by all Class A Shareholder/Directors.

---

[18] Defendant's Concise Statement of Undisputed Material Facts (Doc. No. 132) contains 194 numbered paragraphs.  Plaintiff's Response to Defendant's Concise Statement of Undisputed Material Facts (Doc. No. 143) sets forth responses to defendant's 194 numbered material facts, and an additional 726 material facts to which DMC has responded.

**Firing**

Whether the organization can "fire the individual" is a factor that weighs in favor of

DMC.  Pursuant to the By-Laws, a Class A Shareholder/Director may only be terminated "for

cause" by 3/4 of DMC's eligible Board of Directors.  By-Laws, sections 103(b) and 209. In

Pennsylvania, a by-law is a contract among shareholders.  *Hornsby v. Lohmeyer*, 72 A.2d 294,

299, 364 Pa. 271, 271 (1950).  DMC's By-Laws provide substantial protection to its

Shareholders, requiring a 3/4 vote of Class A Shareholder/Directors who may only terminate the

individual for cause.

**Constructive discharge**

Plaintiff asserts, however, that this protection is an illusion that evaporates when exposed

to the actual practice at DMC to, essentially, constructively discharge any Shareholder the

Executive Committee decides should be terminated.  According to plaintiff, the Executive

Committee accomplishes this action in the following manner.

When the members of the Executive Committee want to terminate the employment of a

shareholder attorney, they reduce the amount of work (especially work for UPMC, the primary

client for DMC) assigned to the attorney, and "as a result of the reduction in work, the billed

hours and profitability of the attorney go down, thereby giving the Executive Committee reason

to lower the compensation paid to the attorney.  With repeated reductions in compensation or the

threat of reduction in compensation, the attorney becomes frustrated and leaves the firm giving

the members of the Executive Committee what they wanted; i.e. the termination of the attorney's

employment with DMC."  Plaintiff's Brief in Opposition to Defendants' Motion for Summary

Judgment (Doc. No. 142) at 4-5.  In support, in addition to her own subjective opinion, based

upon 22 years with DMC, plaintiff offers the affidavits of Hunter A. McGeary, Jr. and David M.

Neuhart, former Class A Shareholder/Directors of DMC, who "testified in their affidavits that

they were targeted by the Executive Committee in this manner.  McGeary left DMC as a result of

the Executive Committee's threat to reduce his salary.  Neuhart left DMC as a result of actual

reductions in his salary made by the Executive Committee."  Plaintiff's Brief in Opposition to

Defendants' Motion for Summary Judgment (Doc. No. 142) at 5 (paragraph references to

Plaintiff's Statement of Additional Facts omitted) (Affidavits at Doc. No. 144-25).

Despite the subjective opinions of three Class A Shareholder/Directors, which the Court

certainly credits for purposes of the motion for summary judgment, the Court finds, as a matter of

law, that there is no genuine issue of material fact – and that reasonable jurors would find - that

only 3/4 of the eligible Class A Shareholder/Directors, such as plaintiff, can terminate DMC

Shareholders, and then only for cause.

**Effect of By-Laws**

Plaintiff would have this Court completely ignore the By-Laws, including their very clear

protections to Class A Shareholder/Directors in requiring a 3/4 vote of fellow Class A

Shareholder/Directors to terminate for cause.  Under Pennsylvania law,  a by-law is a contract

among shareholders,  *Hornsby*, and shareholders and officers of a corporation are presumed to

know the corporation's by-laws.  Section 1505 of Pennsylvania Statutes and Consolidated

Statutes, title 15, provides: "Except as otherwise provided by section 1713 (relating to personal

liability of directors) or any similar provision of law, the bylaws of a business corporation *shall*

*operate only as regulations among the shareholders, directors and officers of the corporation*

and shall not affect contracts or other dealings with other persons unless those persons have

actual knowledge of the bylaws." 15 Pa.C.S. § 1505. DMC, a professional corporation, is governed by the same rules as other domestic corporations in Pennsylvania unless otherwise provided in Chapter 29, "Professional Corporations." 15 Pa.C.S. § 2901(c).

Plaintiff does not claim that any provision of the laws pertaining to professional corporations are inconsistent with 15 Pa.C.S. § 1505, but argues that she is, in fact, an employee and thus is an "other person" as set forth in section 1505, and that under the last portion of section 1505, she cannot be bound by the By-Laws unless she had "actual knowledge" of them. Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment (Doc. No. 142) at 29. There can be no doubt, however, that Ms. Kirleis is a Class A Shareholder/Director of DMC, and under the plain and unambiguous first portion of section 1505, the By-Laws are effective and operational between Shareholder/Directors at DMC. Thus, plaintiff's actual knowledge of the By-Laws is not required to bind her. Plaintiff presumptively knows, or at least is charged with knowing, the By-Laws.

Statutorily, therefore, plaintiff and the two former shareholders who believed they were constructively discharged, presumptively knew they could only be terminated from DMC for cause, and only by 3/4 vote of their colleagues. As a matter of common sense and experience, this statutory presumption is strengthened here, where plaintiff and the other shareholders are all sophisticated attorneys (plaintiff having 22 years of legal experience as an attorney) with knowledge of the law and where to find it.

Faced with a constructive discharge, in the manner plaintiff asserts DMC acts when the Executive Committee wants to fire a Shareholder, it is difficult to fathom any attorney Shareholder not bringing the matter to a vote of the Board of Directors as is their right under the

By-Laws.  The two former shareholders who believe they were constructively discharged did not pursue their rights under the By-Laws, and, on the record before the Court, they apparently (i.e., the record does not show otherwise) reached mutual agreement (although perhaps not mutual satisfaction) as to the terms of their departures.

Plaintiff states (and the District Court and Court of Appeals for the Third Circuit agreed on the basis of the record at that time) that she never received a copy of the By-Laws, and that she understood them to be in revision and a "state of flux."  However, DMC states, without substantive contradictory evidence offered by plaintiff, that the By-Laws were always available for any shareholder to see, and plaintiff reluctantly conceded (after evading a responsive answer for several pages of deposition testimony (Kirleis Deposition at 60-63, quoted in Defendant's Concise Statement of Undisputed Material Facts (Doc. No. 132), at ¶ 13)), that she never actually asked anyone to see the By-Laws.  Whether they were in a state of flux or were in the process of being revised or not, the By-Laws existed somewhere at DMC, and plaintiff is charged with knowledge of the By-Laws by which she was hired and received compensation and benefits.[19]

Not asking to see the document that governs the terms of one's employment at a law firm approaches willful blindness.  Complete disregard for the terms of the By-Laws cannot negate the legal effect of this governing document to the point where it means nothing.

**Finding**

The Court finds, therefore, that the Board of Directors, made up of all Class A Shareholder/Directors, does the hiring and firing of individual Shareholders at DMC such as Ms.

---

[19]   It may have been a wiser practice for DMC to affirmatively distribute copies of the By-Laws to its shareholders, or at least provide each attorney Shareholder with a written notice as to where the By-Laws could be reviewed.  This Court is not here, however, to determine the wisdom of DMC policies.

Kirleis.  This factor weighs *heavily* in defendant's favor, therefore, in support of its position that plaintiff is, in fact, an "employer."[20]

**B-D.   Whether the organization can set the rules and regulations of the individual's work; Whether and, if so, to what extent the organization supervises the individual's work; Whether the individual reports to someone higher in the organization**

Because there is substantial overlap in this case with regard to these factors, the Court will consider record facts relevant to all of these factors in this section.

**The Hierarchy at DMC**

There is a defined hierarchy of attorneys and other workers at DMC in terms of authority and control over operations, both by the By-Laws and in practice.  Plaintiff is in the second tier of the DMC hierarchy (although she is eligible for and could be elected to the first tier), which is structured as follows:  the members of the Executive Committee, all of whom are Class A Shareholder/Directors; all other Class A Shareholder/Directors; Class B Shareholder/Directors; associate attorneys; non attorney administrators and officers, such as the Controller; secretaries, paralegals and other support staff.

**Access to Financial information**

Class A Shareholder/Directors have access to a great deal of financial information about the Firm that those coming behind them in the hierarchy are not privy to.[21]  This is an

---

[20] Judge Lancaster found "compelling" defendant's argument, that "plaintiff, as a shareholder, can only be terminated by an official vote of three-fourths (3/4) of the shareholders [and] Plaintiff can speak and vote on the question of her own ouster, which is something associates are not allowed to do." *Kirleis*, 2007 WL 2142397 at *3.  However, because defendant had not addressed plaintiff's contention "that the Executive Committee can force a shareholder from his or her position by controlling work assignments and compensation," the Court found that factor in favor of plaintiff at that stage of the proceedings.  *Id.*

[21] The financial information include: what additional revenues must be received so that Shareholder/Directors will receive 100%  of their annual projected distribution; the status of the

extraordinary amount of financial information that employees of most corporations, or non equity

partners at law firm partnerships, would rarely be permitted to see. The conspicuous exception to

the Shareholders' otherwise broad access to sensitive financial information is, of course, with

regard to compensation of individual Shareholders.  Plaintiff sees the withholding of that

information and the ability of the Executive Committee to set compensation for individual

Shareholders, with all records being confidential, as key to her lack of independence and her

status as an employee.  As a matter of law, this Court cannot agree.

Section 4.03(f) of the By-Laws, provides that records relating to compensation paid, or to

be paid, to Officers, Directors, or Shareholders must remain confidential "unless disclosure of all

or any part thereof shall be required by a majority vote of the Class A Shareholders."

Additionally, the manner of payment of shareholder compensation, allocation of compensation

between salary and bonus, and decisions about borrowing and repayment of funds to pay

compensation is "exclusively within the discretion of the [Executive] Committee."  Section

4.03(h).

Although it is an important subject, the fact that this one area of DMC financial decisions

is delegated exclusively to the Executive Committee does not mean that everyone else affected

by this delegation of authority and confidentiality is an employee.  Because a 3/4 majority of all

Class A Shareholder/Directors may amend the By-Laws, including the compensation and

---

line of credit borrowing; funding of the Firm's profit sharing plan; the Firm's actual billing
compared to the Firm's budgeted billing and accounts receivable; billing projections by
individual Shareholder/Directors, associates and paralegals, broken down by what was budgeted
for the year; the actual annualized amount for the year and the actual amount for the preceding
year; and detailed analyses of receipts and application of funds, actual to budget, with variances,
with receipts set forth in six different categories, and expenses, including the gross number for
shareholder compensation, set forth in forty-three different categories, among other information.

confidentiality provisions, and because each has an equal vote in the matter, the fact that compensation is delegated to the Executive Committee and confidentiality mandated by the By-Laws, the Class A Shareholder/Directors retain the ultimate control over matters of compensation, unlike mere employees of a corporation.

### Significant Differences of Authority Amongst Attorneys

Between Class A Shareholder/Directors and Class B Shareholders, associate attorneys and administrative and support employees, there are many distinguishing features in terms of the control and authority set forth in the By-Laws and in practice.  Among other things, Class A Shareholder/Directors are able to call special meetings, attend annual Shareholders' meeting, vote on termination, amendments and repeal of the By-Laws and dissolution of the Firm, vote to remove officers and to create new committees;  no associate or other employee may do any of these things, and Class B Shareholders are not directors and have no vote.  Thus, who "reports" to whom at DMC is not a simple question, and the answer will vary based upon where one is in the hierarchy and what particular matters are being reported.

Plaintiff has far more independence than Class B shareholders, associate attorneys and office staff and employees at DMC, but less than members of Executive Committee on a daily basis.  However, as DMC argues, Class A Shareholder/Directors have equal authority under the By-Laws as members of the Executive Committee, except to the extent the By-Laws delegate areas and power to the Executive Committee.  Again, plaintiff argues that the By-Laws are largely a sham, designed to give the appearance of authority and control to shareholders when in reality, plaintiff "reports to" the Executive Committee which calls all of the important shots. In

reality, however, this Court finds that Class A Shareholder/Directors have less independence or control than DMC claims, but far more than plaintiff claims, as discussed below.

**The UPMC Protocols**

Plaintiff's principle argument that she has little actual independence with regard to UPMC cases, on which she is closely supervised and which constitute 90% of her practice at DMC, centers around the directives for case handling, rules and regulations that apply in each and every UPMC handled by DMC, to each and every attorney handling a UPMC case.  These directives were initially, at relevant times, set forth in the "Otto memorandum" until mid-2004, and thereafter in the UPMC directives as enforced (according to plaintiff ) by four members of the Executive Committee (Wiley, Stefko, Conti, and Theis).  The Court will refer to these directives as the "UPMC protocols."

The UPMC protocols were designed to implement and ensure compliance with certain case handling procedures consistent with and reflective of UPMC's expectations and decisions relative to the defense of its insured entities and members in malpractice litigation.  With regard to UPMC cases, plaintiff strenuously argues that she is not truly independent, because UPMC's protocols restricted her discretion in every UPMC case and subjected her to close supervision. The file handling procedures disseminated by Mr. Otto while General Counsel of UPMC's affiliated UHCP Insurance Program at the direction of the client were largely (but not solely) administrative and were designed to ensure uniformity and consistency among the many attorneys at DMC handling UPMC cases.

Each and every UPMC case assignment memorandum was accompanied by a copy of a 5 page memorandum of guidelines prepared by Otto and written on DMC stationery setting forth

specific and detailed directions for handling UPMC cases. For example, Otto entered his court appearance in every case, and assigned the UPMC cases to DMC lawyers; he controlled all settlement discussions with clients and opposing counsel, and the assigned attorney could not even discuss settlement; the assigned attorney was required to file regular status reports on each case; the assigned attorney could not file cross claims or join any medical personnel or hospitals without Otto's approval, or even recommend such actions to anyone.  On the other hand, Otto never attended trials or hearings, and the attorneys were permitted to prepare opening statements and closing arguments, witness preparation and depositions, prepare motions in limine, file preliminary objections, and take other  independent actions in the direct litigation of UPMC cases.  Otto might assign another associate attorney to assist, but plaintiff would supervise the associate.

   Importantly, the rules and regulations for UPMC cases cannot be deemed to be exclusively *Mr. Otto's* directives, even though they were on DMC letterhead and were distributed and monitored in the "Otto memorandum" until mid-2004.  The UPMC protocols were *undoubtedly* (i.e., it cannot be reasonably disputed from the record) approved and adopted by UPMC, by and through its captive insurance program, UHCP, the principle client of DMC and of plaintiff.  While plaintiff argues that Otto created these rules and regulations for handling UPMC cases while he was the President of DMC or Chair of the Executive Committee, she cannot and does not dispute that the "Otto memorandum" was written and distributed when Otto also wore the UHCP General Counsel hat (in addition to his DMC President/Chair hats), or dispute that UPMC and UHCP participated in creating the protocols in consultation with its General Counsel.  Although plaintiff claims not to have known at the relevant time that Otto was

also General Counsel for UHCP, she does not and cannot dispute that, in fact, he was General

Counsel for UHCP, nor can she legitimately dispute (i.e., point to record evidence) that the rules

and regulations for handling UPMC cases set forth in the "Otto memorandum" were created in

consultation with the client, UPMC and UHCP, and adopted with their approval.

If there were any doubt that the UPMC protocols were those of UPMC and UHCP, not

DMC or Otto, they were dispelled in mid-2004, when UPMC decided to form an in-house

litigation group, and to distribute its cases to other law firms in addition to DMC.  It was at this

point, plaintiff alleges, that four members of the Executive Committee (Wiley, Stefko, Conti and

Thess.) formed a sub-committee to take control of UPMC cases in directing DMC Shareholders

and attorneys as to how the UPMC cases were to be handled.  The UPMC protocols as of mid-

2004 were on UPMC stationary, and were distributed to every attorney handling cases for

UPMC, whether DMC lawyers or lawyers at other law firms.  Many if not most of the UPMC

protocols regarding such cases were adapted from the Otto memorandum.

Further, the UPMC protocols, either under Otto's memorandum or UPMC's own

document, had to be followed by every attorney handling any UPMC cases, including members

of the Executive Committee.  To the extent plaintiff argues her independence was circumscribed

by the UPMC protocols, so too was the independence of those members of the Executive

Committee assigned to UPMC cases, who plaintiff claims are her employers.

A reasonable juror could not find plaintiff to be an employee based upon rules and

regulations governing every attorney handling the Firm's largest client's cases, including

attorneys who plaintiff claims are her employers on the Executive Committee.  The record does

not support the inference that Class A Shareholder/Directors are so closely supervised and their

legal discretion so restricted in UPMC cases that they may be considered to be "employees."

**Other Matters Bearing on Supervision and Control**

UPMC is not DMC's only client, nor plaintiff's only client.  Once a Shareholder's new

origination is approved for conflicts and financial viability, a Shareholder retains almost

complete autonomy with respect to any cases he or she originates.  There is no dispute that

plaintiff maintained almost complete autonomy with regard to her own clients.  She was free to

turn down UPMC assignments like any of the Class A Shareholder/Directors (unlike Class B

Shareholders and associates, who could not refuse an assignment) and to develop more of her

own clientele.  When she accepted UPMC assignments, plaintiff knew such cases were subject to

the UPMC protocols, regardless of who was handling the case.

Plaintiff also set her own hours and work schedule, within the minimum and maximum

billing hours adopted by the Board of Directors, could work from home, and could work on

weekends or not.  Associate attorneys and staff employees did not have the same flexibility in

scheduling.

Plaintiff also maintains that she had little or no control over hiring of staff or their

salaries, including her own secretary who was assigned by the office manager, that she could not

write checks on behalf of DMC to cover even routine expenses, and that she had to seek prior

approval from members of the Executive Committee before spending any DMC funds for client

entertainment.  As with the UPMC protocols, plaintiff was subject to the same rules and

regulations with regard to these matters as were all other Class A Shareholder/Director's, except

for those areas delegated to the Executive Committee, and plaintiff had more authority over these

matters than did Class B shareholders and associate attorneys, who she could supervise to a significant extent, especially in her capacity as Chair of the Associates Review Committee.

Based on all of the foregoing, the Court finds that plaintiff, as a voting Class A Shareholder/Director, had ultimate control over the rules and regulations of her work because she could promote and seek amendment to the By-Laws and other DMC practices and policies, that in practice she retains a significant degree of independence in her employment, that she supervises associate attorneys and staff members assigned to support her, and that she has meaningful opportunity to influence decisions at DMC. These three *Clackamas* factors, therefore, also favor a finding that plaintiff is not an "employee," and is instead an "employer" for purposes of the anti-discrimination laws.

> **E.    Whether and, if so, to what extent the individual is able to influence the organization**

Plaintiff served as a member of various sub-committees of DMC, including as Chair or Co-Chair. During the relevant time period, plaintiff held various management positions, including: Chair of the Associate Review Committee, member of an ad hoc committee charged with administering an Executive Committee election, and member of the Shareholder Evaluation Committee. Plaintiff downplays her roles on these sub-committees, and dismisses them as merely administrative, but the record indicates that these were substantive and important positions within DMC, and not merely administrative. For example, the Associates and Class B Shareholders surely did not consider the Chair of the Associate Review Committee or a member of the Shareholder Review Committee to be "merely administrative." Additionally, the Court

finds it revealing that previously she has described herself as the only "female in management," and otherwise as being in management at DMC.

Perhaps most important, plaintiff was eligible to be elected to the Executive Committee by her fellow Class A Shareholder/Directors, and, as a member of the Board of Directors, she had the ultimate authority under the By-Laws, even though she did not frequently exercise that authority. And, in fact, plaintiff did influence significant decisions of the Board of Directors.

Plaintiff voiced her opinion opposing the election of a female Class B Shareholder to Class A, against the recommendations of the Executive Committee, and her opinion prevailed. DMC offers numerous other examples of non Executive Committee Shareholders making recommendations, and serving on sub-committees proposing policy and practices that the Executive Committee did not agree with. Plaintiff participated in 42 annual and other Board of Directors meetings, wherein policy and business was discussed and decided, and she had the ability to attend all meetings of the Board of Directors, read the minutes, and make amendments to By-Laws.

The fact that plaintiff and most of the Shareholders generally deferred to the recommendations of the Executive Committee does not demonstrate that Executive Committee Shareholders are employers and non Executive Committee Class A Shareholder/Directors are employees. At most, this reflects the economic and political realities of the practice of law and divisions of labor at a large law firm.

Traditionally, partnerships-law firms are not democracies, and often are dominated by one or a few "autocratic" partners, but this reality does not render every other partner in the firm an employee even though he or she retains most of the indicia of ownership and control. The Court

finds the partnership cases applying an economic realities test to determine if partners are

employees to be most helpful, as the economic realities test takes into account myriad facts and

circumstances similar to those considered under *Clackamas*. See *Ziegler v. Anesthesia Assocs. Of*

*Lancaster, Ltd.*, 74 Fed. Appx. at 200-01 (district court's application of economic realities test to

determine shareholder-physicians were employers affirmed as analysis "closely tracked" the

*Clackamas* analysis).  In this regard, see e.g., *Solon v. Kaplan*, 398 F.3d 629, 633 (7th Cir. 2005)

(law partner of four partner firm was not "employee" entitled to sue for retaliation under Title

VII, despite his argument that he had been cut out of any real decision making by the other three

partners acting behind his back and that the partnership agreement was illusory); *Schmidt v.*

*Ottawa Medical Center, P.C.*, 322 F.3d 461 (7th Cir. 2003) (physician who was shareholder-

director in medical center operating as closely held professional corporation was a bona-fide

partner-employer, and thus he was not defendant's "employee" under ADEA);  *Equal*

*Employment Opportunity Commission v. Sidley Austin Brown & Wood*, 315 F.3d 696, 702 (7th

Cir. 2002) (in ADEA  case, "it can be argued that partners should be classified as employers

rather than employees for purposes of the age discrimination law because partnership law gives

them effective remedies against oppression by their fellow partners . . ."); *Serapion v. Martinez*,

119 F.3d 982 (1st Cir. 1997) ("we conclude that while Title VII's employment-related shelter

might in certain circumstances extend to a person who is a partner in a law firm, plaintiff . . . , a

partner in [a] now-disbanded law firm . . . , is not entitled to such shelter here" after

consideration of the economic realities of the partnership);  *Auld v. Law Offices of Cooper,*

*Beckman & Tuerk*, 981 F.2d 1250 (4th Cir. 1992) ("traditional partners are not 'employees' of the

firm as an independent entity for the purposes of Title VII.  Furthermore, several other Circuit

Courts have held that partners and their equivalent are not Title VII employees.") (collecting cases); *Fountain v. Metcalf, Zima & Co., P.A.*, 925 F.2d 1398 (11th Cir. 1991) (economic reality was that plaintiff was akin to a partner in the accounting firm;  analogizing accountants in professional corporation to partners in partnership, Court of Appeals rejected assertion that the "autocratic" actions of the firm's president constituted a reasonable basis for concluding that the plaintiff was an employee, stating "[d]omination by an 'autocratic' partner over others is not uncommon and does not support a finding that the others are 'employees.' ") (quoting *Wheeler v. Hurdman*, 825 F.2d 257, 273-74 (10th Cir.1987)); *EEOC v. Dowd & Dowd, Ltd.*, 736 F.2d 1177 (7th Cir. 1984) (en banc) (shareholders in law firm organized as a professional corporation not employees because they function as partners).

The Class A Shareholder/Directors at DMC are equity owners, and have much independence, as do partners at a traditional partnership structured law firm.  Members of the Executive Committee hold more operational authority and power delegated under the By-Laws and in practice, as at traditional partnership structured law firms.  That one or a few attorneys have much greater power and influence within a law firm at any given time does not make the other attorneys in the firm, whether partners or shareholders, "employees."  Plaintiff's position as Class A Shareholder/Director is quite similar to that of equity partners of partnership law firms, who are generally found to be employers.  (The Court notes that plaintiff has offered no authority wherein an equity partner or a shareholder of a professional corporation practicing law was deemed to be an employee of the partnership or corporation.)

The Court finds that plaintiff has substantial influence over the professional corporation, much more so than Class B Shareholders and associate attorneys, although certainly less than

members of the Executive Committee.  This factor also favors a finding that plaintiff is an employer, not an employee.

F. **Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts**

Labels and titles used in agreements, tax records and other documents are not strong indicators of whether a person is an employee or employer under *Clackamas*.  Many of the examples plaintiff uses of "employment" and "employee" in various documents are equally applicable when used in reference to members of the Executive Committee, who, as plaintiff argues, are no doubt "employers" under *Clackamas*.

The intent of DMC with regard to employees and employers is derived more from the other *Clackamas* factors and the economic realities at the professional corporation, rather than from titles and labels used in written documents, as well as from By-Laws which set up the organizational structure of the corporation.  Pursuant to Section 3.08(g) of the DMC By-Laws, plaintiff and all other Class A Shareholder/Directors receive a comprehensive package of benefits that associate attorneys/employees and other employees of the Firm are not entitled to and do not receive, and plaintiff has availed herself of these rights and benefits.

It is the totality of all documents, including the By-Laws, and the conduct of DMC vis a vis its Shareholders, associates and other employees that determine the intent of both plaintiff and DMC that Class A Shareholder/Directors are owners of the Firm, not employees, and not merely employed by it.

-44-

**G.      Whether the individual shares in the profits, losses, and liabilities of the organization**

**Fringe Benefits**

As noted, plaintiff was entitled to the maximum fringe benefits pursuant to the By-Laws, including choosing to attend non DMC sponsored continuing legal education seminars, at DMC expense.  Class B Shareholders and associate attorneys did not have the option of choosing any CLE seminar to attend, or for full reimbursement by the Firm.  Plaintiff traveled to Rome, Italy, in June of 2006 for a continuing legal education seminar sponsored by Duquesne University Law School;  DMC paid the cost of this trip, totaling $4,410.26 for seminar registration, airfare and the $2,000 trip spending allowance.[22]

In fact, plaintiff accepted all of the Class A Shareholder/Director benefits package set forth in the By-Laws.  Only Class A Shareholder/Directors received all of these benefits, although a couple of office administrators and the Firm Controller received parking and/or car allowance.  Ms. Kirleis's acceptance of compensation and a comprehensive package of benefits pursuant to the By-Laws certainly weakens her argument that she is not bound by the By-Laws, even if, as she asserts, she never saw them.

**Compensation**

Plaintiff argues that the annual compensation paid to her and the other Shareholders of DMC is not based on ownership interest in DMC, which is supposedly in equal shares, but rather is "a salary that is determined in secret by the Executive Committee using the same criteria it uses to determine the compensation paid to associate attorneys who DMC admits are employees

---

[22] Plaintiff does not deny the historical facts regarding the trip to Rome and reimbursement by DMC, but she denies that it was "pursuant to the By-Laws."

of the firm." Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment (Doc. No. 142) at 25.  Because the Executive Committee sets the compensation without input from the whole Board of Directors, and because the percentages are not equal amongst Shareholders, plaintiff argues she cannot be considered to share in the profits and losses of the corporation.

It is not disputed that each year in January, the Executive Committee projects the amount of profit it projects will be available for Shareholder compensation. DMC defines profit (or net profit or net distributable revenue) "as the amount of money left after DMC pays all expenses of the firm except shareholder salaries." *Id*. at 26.  The Executive Committee then determines each Shareholder's projected compensation for the year in terms of a dollar figure, and "allocates an alleged percentage of ownership of the firm to each shareholder by backing out each shareholder's projected compensation from the total projected amount of money available for distribution, which is supposed to represent the shareholder's ownership or equity interest in the firm." *Id*.  Additionally, Kirleis asserts, she does not participate in any "true profits" of DMC because the Executive Committee can and does manipulate the costs to the Firm by awarding bonuses and raising salaries at will and without notice to or input from Kirleis or other shareholders of DMC.  *Id*. at 26-27.

On the other hand, DMC offers record evidence, the substance and historical accuracy of which plaintiff does not dispute, of the following facts.  Pursuant to Section 4.03(h) of the By-Laws, plaintiff's compensation, like that of all other Class A Shareholder/Directors, is set in January of each year for that calendar year by the Executive Committee, on which plaintiff is eligible to serve upon election or appointment.  Compensation of all Class A Shareholder/

Directors is set as a percentage of the Firm's profit, considering a number of factors utilizing a "whole lawyer" approach for individual Shareholder compensation.

The Shareholders are advised in writing what their estimated distribution in dollars will be if DMC makes exactly 100% of its projected net distributable profit, which is, as plaintiff states, annual revenue less all costs, including salaries and benefits of all associate attorneys and other employees.  Shareholder/Directors divide the net profits based on their allocated percentage share as set each January, and as a result, a Shareholder's final annual compensation may be more or less than the estimated distribution made the preceding January.  Defendant's Concise Statement of Undisputed Material Facts (Doc. No. 132), at ¶¶ 123-126.

Citing numerous examples, the substance and historical accuracy of which plaintiff does not dispute, DMC demonstrates the following facts relating to annual compensation.  When DMC's net distributable profits exceed estimated net distributable profits, plaintiff earns more than was projected at the beginning of the year, which is called a bonus; when its net distributable profits fall short of the estimated net distributable profits, plaintiff earns less than was projected at the beginning of that year; plaintiff and all other Shareholder/Directors have seen declines in their compensation in years that DMC's net distributable profit has been less than was available the prior year.  Id. at ¶¶  127, 129, 131.  However, in years in which the firm's profits were less than or more than anticipated at the beginning of the year, the compensation paid to associates and other staff workers at DMC does not fluctuate. Id. at ¶¶  128, 130.

In other words, when DMC's profits go up, Shareholders' compensation, but not associate attorneys' and staff workers' compensation, goes up; when DMC's profits go down, Shareholders' compensation, but not associate attorneys' and staff workers' compensation, goes

down.  There is no legitimate dispute that the compensation paid plaintiff and the other Class A

Shareholder/Directors reflects the Firm's profits, and is, therefore, a prime indicator of ownership

under *Clackamas*.

Plaintiff offers no authority for her argument that her compensation does not reflect "true

profit" because the Shareholders receive unequal shares, or that the pool of money distributed at

year's end is not "true profit" because the Executive Committee may cause the pool of money to

increase or decrease by manipulating costs, such as by awarding bonuses and adjusting salaries at

will.  Just as one would not expect all equity partners at a large partnership law firm to receive

equal shares of the profits, so too for equity shareholders of a professional corporation.  Unequal

distribution of the profits does not make compensation based on a percentage of that profit any

less dependent upon profit, nor does the fact that an Executive Committee may reduce a law

firms' profits by increasing costs.  Compensation remains a product of percentage of profits.  See

*Hishon*, 467 U.S. at 80, n. 3 (Powell, J., concurring) ("Divisions of partnership profits, unlike

shareholders' rights to dividends, involve judgments as to each partner's contribution to the

reputation and success of the firm. This is true whether the partner's participation in profits is

measured in terms of points or percentages, combinations of salaries and points, salaries and

bonuses, and possibly in other ways.").

**Liabilities**

Every Shareholder at DMC makes a $7,500 capital contribution toward liability.

Associate attorneys and other staff employees do not make capital contributions.  Plaintiff

suggests this is a nominal amount in comparison with DMC's annual revenues and potential

liability exposure, and speculates that the nominal amount is intended to give the illusion of

ownership.  The Court finds that this capital contribution, and plaintiff's exposure to DMC's

potential liabilities, is not insignificant.  The capital contribution of 61 to 69 Class A

Shareholder/Directors is in the neighborhood of $500,000.00, not an enormous liability fund but

not exactly worthless.

As DMC asserts, using this litigation as an example, if DMC was exposed to liability

beyond that amount, there are various ways it could generate funds for payment.  (Plaintiff is

"without knowledge" and so denies DMC's assertions about the ways in which it might fund a

judgment, but she does not counter DMC's assertions with any facts of record.)  DMC could pay

the judgment out of its current revenues, which payment would diminish the net profits available

for distribution to all Shareholders, including plaintiff; DMC could borrow money to satisfy the

judgment, and then that money would have to be repaid with interest, which would diminish the

net profits available for distribution to all Shareholders, including plaintiff; or DMC could issue a

capital call to its Shareholders pursuant to the By-Laws to satisfy a judgment, which would

require all Shareholders, including plaintiff, to increase their amount of capital in the Firm.

Liability will be borne by the Class A Shareholder/Directors of the Firm which, in one

way or another, will affect the Firm's profits or losses.

The sixth *Clackamas* factor, the monetary factor, weighs heavily in favor of DMC.

## V.        Conclusion

As Justice Powell stated in the *Hishon* case, which held that Title VII precluded a law

firm from denying partnership consideration to an associate on the basis of her gender, the

Court's opinion "should not be read as extending Title VII to the management of a law firm by

its partners." *Hishon v. King & Spalding*, 467 U.S. 69, 79-80 (1984) (Powell, J., concurring).

Justice Powell continued as follows:

> The reasoning of the Court's opinion does not require that the relationship among partners be characterized as an "employment" relationship to which Title VII would apply. The relationship among law partners differs markedly from that between employer and employee – including that between the partnership and its associates. The judgmental and sensitive decisions that must be made among the partners embrace a wide range of subjects. The essence of the law partnership is the common conduct of a shared enterprise. The relationship among law partners contemplates that decisions important to the partnership normally will be made by common agreement, . . . or consent among the partners.

*Id.* (footnotes omitted).

Since *Hishon*, "several appellate courts have followed Justice Powell's lead and declared, with varying nuances, that partners are not protected as employees under federal anti-discrimination laws." *Serapion*, 119 F.3d at 986 (citing *Simpson v. Ernst & Young*, 100 F.3d 436, 443 (6th Cir. 1996), *cert. denied*, 520 U.S. 1248 (1997) and *Wheeler v. Hurdman* , 825 F.2d 257, 263 (10th Cir. 1987)).

While under the *Clackamas* case, a partner in a legal partnership should not automatically be deemed an employer, the indicia of control and ownership in traditional large firm partnerships tilts toward recognizing equity partners as employers and not employees, although all factors must be considered. Ms. Kirleis shares many of the attributes of traditional equity partners in a large law firm partnership. She owns DMC as much as any other Class A Shareholder/Director owns it, including members of the Executive Committee and its officers, and she shares in its profits, losses and liabilities, unlike those employees and associate attorneys whose salaries are is fixed. Moreover, the comprehensive and generous fringe benefit package

that plaintiff accepts is obviously an emollient of ownership that Class B Shareholders, associate attorneys and other employees of the Firm do not receive.

Additionally, plaintiff participates meaningfully in Board of Directors  meetings, decisions, policy and business of the Firm, although members of the Executive Committee have greater participation by virtue of the delegation given to them by plaintiff and the 3/4 majority of the Board of Directors.  Plaintiff could, if she garnered enough support, be elected to the Executive Committee herself, and she could amend the By-Laws.

The factors relevant to ownership and remuneration provide powerful indications that the appellant should not be treated as an employee for Title VII, PHRA and FLSA purposes.  On management and control issues, the determination is not as heavily weighted toward a finding of "employer" status, but, nevertheless, still strongly favors the finding that plaintiff is not an "employee" of the professional corporation.

Under all of the circumstances of this case and the *Clackamas* test, the Court finds that Ms. Kirleis is an "employer" as that term has been defined by the courts under the anti-discrimination laws.  Accordingly, summary judgment must be granted in favor of DMC.

An appropriate Order will be entered.


**SO ORDERED** this 28th day of October, 2009.

 s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc:  all counsel of record